Good morning everyone. I want to thank everyone for indulging us with the late start. There was some business this morning that spilled over to the afternoon. We're just now able to free ourselves to hear this. Before we start, I want to take just a second to thank Eleanor Cynthia Roof, who's a very distinguished district court judge, who graciously consented to sit with us for this sitting. After this case, she may never, ever come back to the Third Circuit. As you know, we're not all like this. I cannot contradict my colleague. That means we're not seeing her again. I also want to, and this is obviously by no means a way of pessimizing, I have not seen Dean Faulman in how many years? Seven or eight, I guess. Good to see you, Judge. Likewise. It's the days of Nicole Carr, so it's been a while. Are we ready to proceed? May it please the court, my name is Jonathan Greenblatt. I represent the appellant, Rhodia S.A., and I've reserved two minutes for rebuttal. Two minutes? Two minutes. Okay. You're a confident man. Your Honors, Rhodia's request for dismissal or for a stay in favor of arbitration is based on estoppel, as the court knows. Let me ask, because there's so many questions. One of the many things that boggles my mind about this case, what after the partial award by the panel in France, what's left? If you win, what does your victory look like? You win a victory here, and then you go back to a forum which has said that you're not good for it. I understand the question, Your Honor. Rhodia's rights, Rhodia S.A.'s rights, and I think we have to step back and just look at the relationship of the parties for a second to answer your question. Rhodia S.A. is the ultimate holding company on the Rhodia side. It's not an operating company. It has very few employees. Not the lawyers, though. The lawyers have been dragged in. Rhodia Operations is the operating company that does the business, and Rhodia Nill owes Rhodia Operations. The reason I'm raising this is that Rhodia Operations and Rhodia Nill are participating in the arbitration, and they are signatories of the various agreements that I'm going to try to describe to the court. The joint venture they signed? Rhodia Nill is a signatory to the joint venture agreement. Rhodia Operations, these are all by successor and interest status because of the change in ownership over the years. Okay, now let's wrap it in the hat. You say JBA was signed by Rhodia Nill. Yes. They didn't actually sign it. You're saying that they stepped into the shoes of the signatory? Correct. That's different. Right. Everyone in this case, because Rhone-Polonc, if we step back just another step. Which Rhone-Polonc? Rhone-Polonc was the chemical company and pharmaceutical company that then sold the pharmaceutical business to and became Aventis, and then spun off the chemical side of the company, and that became Rhodia, Rhodia S.A. And Rhodia S.A. then is structured with Rhodia Operations as the company that has the employees, that does the work. But in this case, we'll be working with any technology that the arbitral tribunal says they can work with. Rhodia Nill is a holding company in between them that owns Rhodia Operations. Okay. So I'm clear. After the joint venture agreement between the parties – I won't try to pronounce it. I think it – well, I hope it's not pronounced it. Bouchamie? Bouchamie. Bouchamie. Between Bouchamie – well, the Bouchamie joint venture, that is basically a combination of DuPont France, as I'll call it, for simplicity, and F-U-C-R-P. Correct. That document was not signed – directly signed, penned by the parties to this suit. You mentioned earlier they signed it because they stepped into the shoes or the successor signed it, but the parties didn't sign it. Well, to be accurate, neither party here today, even by successor and interest, that has signed that document. There's a network of agreements that I'd like to explain to the court, which I think are critical, because Estoppel is fact-based. I mean, all the courts have said that you need to look at the facts and circumstances. They're all different and every case is different. And this case is not the traditional case. There are two key facts that I think are important for the court to keep in mind as it evaluates the Estoppel-based argument. First is when the joint venture was formed back in 1974 between the DuPont family of companies and the Rhone-Pelanc family of companies, they understood right from the get-go that there was going to be a sharing of the technical information that's in dispute in this case. The so-called Gen 1 information that was used to build this ADN plant in Chalampais, France, in 1974. It was understood there was going to be a sharing of information because the parties were making different contributions. DuPont was contributing the technology, Rhone-Pelanc through the various entities. I didn't understand that. I'm just not sure it helps you, because as I understand it, the flow of information and the flow of technology was done not in the joint venture agreement, but primarily by way of the licensing agreement. I know there are other exhibits that have joint venture agreements, but it's the licensing agreement, isn't it? They really conveyed the technology. That's actually what I would like to address, because I think that ignores the way the information actually flowed. I understand why you might think that. That's been in VISTA's theory of the case. That theory, by the way, was completely rejected by the arbitral tribunal in phase one, but let me explain why. You have to look at this as a flow chart almost from left to right of the way the information moves. We all have flow charts. Right. Okay. So I'll try to help me visualize it. So it goes from, it went from DuPont to the joint venture that was formed between these parties. But it doesn't stay in the joint venture. Article 9 of the joint venture recognizes that information will then flow from the joint venture to various, on the one hand, Rodeo parties, formerly Ron Polonc, and on the other hand, various DuPont parties. And every time knowing that, when you read the language of Article 9, neither party will. And it's specific to the parties of the joint venture agreement, even though other places in the joint venture agreement, you specifically talk about affiliates and subsidiaries. If you prevail here, why aren't we basically rewriting Article 9 to include the language of affiliates and subsidiaries where it doesn't exist because it's specific to two parties in Article 9? Why would you draft it that way? Well, I think it was drafted that way between the parties because it was understood that there was going to be this flow. So the first two parties are the joint. I think the first two parties are the joint venture partners. Okay. They are the ones who are going to be working on it. And remember, the first joint venture partner on the Rodeo side was a company called Sucrep. Sucrep was the chemical operating company of Ron Polonc. Ron Polonc, as I said, and Rodeo now is just a holding company. So there was not going to ever be a flow of information designed to get to Rodeo or to Sucrep. It's not that they wouldn't necessarily see it or work with it, but they weren't going to be the principal parties who were going to be there. Isn't that a little more reason to draft Article 9 as well as the arbitration clause in a way? And what I was reading obviously wasn't the arbitration clause. That's Article 23. But why wouldn't you draft them so that it anticipates this? Article 23 is as narrow, if not more narrow. It says the party's here too. It could say the party's here too. They're subsidiaries of the company. Well, I think the way they got at that was through the other ancillary agreements that were all part of the same network as you watch the flow of information. In other words, it goes into the joint venture pursuant to the license. It then is recognized under Article 9 that it will come out of the joint venture to the joint venture partners. And those joint venture partners, their conduct, the ability to use and disclose the information is governed by Article 9. There's also other ways that information flows to Rhone-Polonc or the Rodeo and other entities, and that's through the other ancillary agreements because it was contemplated right from the beginning that various Rodeo entities were going to provide services, engineering services, et cetera. That's what I was explaining at the beginning. All the personnel to run this plant came from the Rodeo side. The technology came from the DuPont side. The party's understood. That doesn't answer the question. All that you're saying seems to me all the more reason to draft Article 23 in a way that's different than the way the language actually appears. Everything you've said so far suggests that Article 23 was drafted intentionally for some reason to be operative between the two parties to that agreement. Well, the reason I think not, Your Honor, is because, remember, the rights, in other words, what that party can then do with the information is that after 15 years, it can share it with third parties or the world. So to the extent that the parties to the joint venture can share it, then obviously any other Rodeo entity can also use it, including the defendant in this case. But if that anticipates a situation where one of those other parties gets into a dispute about whether or not the 15-year clock is running, I guess that's what's going on in the firms now. If some dispute arises out of the limitations of the confidentiality agreement, again, it seems like you draft Article 23 in a way that would anticipate that and include an obligation to arbitrate more broadly than just the – I guess at the time Article 23 was drafted, you did not have the PSA or the PTIA. They came later. Clearly, those are in connection with DuPont's sale to Invista. It's not an unforeseeable event. I mean, I'm sure it wasn't on the books then or planned then, but it's certainly possible, especially with these corporate entities and some companies like DuPont functions, you could foresee that in the future DuPont might sell some of its technology that would implicate this joint venture and that if you want an arbitration clause that's going to include the subsequent purchase of that technology, again, you include affiliates, successors, something like that. Well, I think by operation – no one's really contested in this case that the successors and interest step in the shoes of the various parties. That's not really – Well, I don't know how big – you might be disagreeing about how big that shoe is. To the extent that the successor interest steps into the 15-year shoe, maybe, but the extent that successor interest steps into the Article 23 shoe, I'm not sure that's what you're arguing. That's your assumption and your estoppel argument. Well, it gets to estoppel, which I'll get to in a minute, but both parties, I think, accept that the successors and interest to the original signatories have the right to arbitrate. In other words, there's been no contest. Under the JVA? Under the JVA. There's been no contest in the arbitration that Rodia Nil and that in Vista's – now it's called Costa France – are proper parties and proper signatories. That's not an issue. The question is, what can the parties who had access to the information pursuant to these agreements do with it? And what the Rodia parties did was started the arbitration order to determine their rights to build the plant. And that arbitration is ongoing, and it is determining those rights. Our argument is that Rodia SA's rights are completely derivative of the rights that are going to be determined in the arbitration. And the tribunal went one step further and then held that certain other parties are proper parties because of their participation in the JV, which would really overlap with a benefit from the JVA concept for purposes of this case in an estoppel context. But in case there's any misunderstanding, I do want to clear it up. There is no dispute that as between the two signatories to the JVA, that there is a dispute going on and that is being arbitrated as to what they can use. The dispute was whether Rodia SA is a proper party to that proceeding, and our argument is the absence of Rodia SA from that proceeding does not end the inquiry here because the alternative estoppel doctrine that we're basing our argument on always presumes – it's always commenced by a non-signatory against a signatory to an arbitration agreement. The reason I think the network – Again, that gets me driving in the head. You don't know of any case, do you, where you have two non-signatories involved in arbitration, one non-signatory trying to compel the other one to proceed through arbitration? Your Honor, there's no case either way. There's no case saying you can't do that. There's no case saying you can. The estoppel doctrines are, as I said, fact and case specific. That's why I think it's important to visualize the entire network of agreements because INVISTA here, as the successor to DuPont, signed the first agreement that put the technology in motion, if you will. That was the license agreement that put it into the joint venture agreement. That agreement has an arbitration clause, and that agreement has a 15-year confidentiality and use clause prohibition. Then it moves from the joint venture to the different joint venture partners, originally Sucrep, the top chemical company on the Rodia side, and DuPont France, and they work with it. They have to work with it. That's by definition. They're going to be working with it all the time. Then it moves out again through various other ancillary agreements, which the tribunal said may fall under the umbrella of Article 9 because Article 9 of the JBA is the master agreement, if you will. So if you track the information as it moves from left to right, there's a common denominator as it moves along every time. Of course the parties change hands because it moves. So INVISTA gives it to the licensor with an arbitration clause. So the reason I'm explaining this is this is different from any case. Right. I understand. It's not an arbitration under that agreement because the way it was all conceived was there was a network of agreements, all of which have arbitration clauses, and the signatories on both sides are going to change as it moves from donor to recipient along the way. So it could have been resolved had that magic language successor or affiliate been included in Article 23. I think the affiliate point I understand. I think the successor point is not so much in contest. I don't think people are arguing that the successors to the signatories don't have the right to arbitrate. The argument is can an affiliate invoke the right to arbitrate? And that's where we say the alternative estoppel doctrine. I realize I've exceeded my time. Just a moment. I haven't even touched jurisdiction yet, which is even more of a mess than what we've been talking about for 15 minutes. But I do think it's important, with the Court's permission, to understand that the flow does move as the parties change. We are invoking the alternative estoppel doctrine, and our argument is that we fit the test for two reasons. First of all, we are a non-signatory who's closely aligned with a signatory. We wholly own Rodia Nell and Rodia Operations, the signatories to the various agreements that talk about what can be used after 15 years and the parties who will be building any plant that will ultimately be built based on what the arbitration tribunal awards. But you're really not arguing the piercing of your own corporate veil. No, we're arguing that by virtue of clauses, by virtue of the fact that we're closely related to signatories to arbitration agreements, that we can invoke the arbitration clause if the plaintiff's claims are inextricably intertwined with the issues that arise under the agreements that have arbitration clauses in them. And in this case, they do. I'm sorry? You're relying on the licensing agreement here, right? It's only to get the ball started. I'm making the point that this is not a... Isn't there a right to arbitrate, though, contained within the licensing agreement? We don't think so, Your Honor, because we think that that is sort of asking the Court to turn a blind eye to the rest of the flow of information. It goes into the JV pursuant to the license agreement, but it doesn't stop there. It moves out to the parties, and there's a continuum of agreements that cover that. All right, but even if we agree with that, isn't it true that you argued something different to the district court than you're arguing here? Your emphasis in the district court seemed to be on the joint venture agreement, conferring the right to arbitrate, whereas on appeal it appears to be through the licensing agreement. No, no, if I've given you that impression, I don't mean to say that. I'm using the license only to show that INVISTA is a signatory to the first agreement in the chain. You didn't give me that impression from the briefs. It's nothing you said here. I'm talking about what was in the briefs. Our argument was they said in their papers that their claims arise under the license agreement, and our point was if that's so, the claims arise under the license agreement, then they arise under an agreement with an arbitration clause in it. And who signed? Pardon? And who signed? The joint venture and INVISTA by successor and interest status. Okay, you said that clause in there, by successor and interest. Well, because they know they get to you, too, as powerful in your assumption argument. Yeah, and the reason I do that, Your Honor, is because INVISTA's position, they've made these allegations in the complaint continuously, is that they own the technology now, and they have the rights in the technology, and in their brief they invoked the confidentiality expectation in the license agreement. So that's why I believe they are stepping in the shoes of DuPont as the party in interest under the license agreement. But you can step into a deal like this or these. There are two separate issues. One is the licensing agreement suggests the kind of proprietary information that would go with this kind of a manufacturing process. The arbitration clause is very different. That's just a way of resolving disputes. One wouldn't necessarily assume that if they get this kind of proprietary information, they're bound to arbitration. They may well assume that, yeah, we're bound to confidentiality. Well, if you're bound to confidentiality, and if you're going to invoke the confidentiality, the estoppel doctrine says you can't embrace the contract for purposes of imposing a duty and walk away from the arbitration clause in the doctrine. That's what a number of courts have said, including the DuPont case decided by this court. It said if a plaintiff embraces the agreement and then seeks to turn its back on the arbitration clause, they should be estopped from doing it. Our argument is that their misappropriation-based claims are dependent on the joint venture contract and the other ancillary agreements, all of which have these confidentiality and use clauses. Why do I say that? For two reasons. First of all, they have to establish that when they share the information, it's still a trade secret. Their complaint recognizes this. But doesn't the PSA and the PTIA also have confidentiality agreements? The PSA and PTIA were the claims they added after they came from Texas and then when they went to New York. Those are claims that allege that DuPont has breached various relationships, various obligations under those agreements with them in VISTA, and the argument in this case is that we have essentially induced that breach. Those are separate from- I understand that, but they didn't sign that. I'm trying to-I ask that because it seems to me that your estoppel argument, you're saying correctly that law says you can't embrace certain parts of the agreement and then walk away from other parts, and that gets you to the estoppel. But that only works in a situation where a party is actually availing themselves of the goodies and rejecting-taking the fruits and rejecting the vegetables, if you will. Understood. We don't really have that here, do we? If they have an obligation that arises from an agreement that they themselves are party to, is it fair to say because you signed this agreement, which contains a confidentiality provision, you're enjoying the benefits of another agreement, which also contains a confidentiality agreement, but you didn't sign, but you guys take the arbitration provision in that other agreement you didn't sign because you're relying upon confidentiality? Let me tell you why I do think it's correct. I think that, again, it's because the information goes into the licensee, and then it comes out, and everybody understands that. If we don't violate those agreements, then the other agreements, not the license agreement, the arbitral tribunal considered whether their argument that it stays in the licensee and it never comes out, whether that was correct. And the arbitral tribunal said that's not correct, that the joint venture agreement contemplated it could be used, would be used, and to the extent the RODEA entities got the information more than 15 years ago through these channels, that it can use it. So my point is they do need the whole network, and the complaint makes this clear, and I would take it, well, when I say clear, clear if you understand the facts. I mean, they've done everything they can to make it money. But in paragraphs 4 and 54 of the complaint, just as examples, in both places, vaguely, they allude to the confidentiality agreements that were signed by the joint venture partners, which were critical to their letting go of the technology in the first place. Those agreements are, not by naming the complaint, because they're studiously avoiding naming them, the joint venture agreement and ancillary agreements. How do we know that? They say the joint venture partners signed various agreements. Those are the agreements the joint venture partners signed. The joint venture partners aren't a party to the license. The joint venture is a party to the license. Because it was understood the information would be shared and would move, they needed to be sure that as it moved each time it was protected and that it had the same 15-year confidentiality clause in it, and they all had arbitration clauses, every agreement. The parties change when it goes from a different donor to a different recipient in these affiliated company chains. But what they've done is, instead of suing under their own theory of the case, their theory is that Rhodia SA, the ultimate parent company, has essentially conspired with its subsidiaries to misuse the information, to misappropriate the trade secrets. They didn't sue any signatory along the way that signed any of these agreements, obviously to avoid having a signatory on the defense side of the case. They arced over the entire chain of parties to sue the ultimate parent, Rhodia SA, who didn't sign an agreement because it doesn't work with the technology. Its liability is completely derivative to what Rhodia Operations, Rhodia NIL, the signatories to the agreement, can actually do. So, you know, by, in essence, picking a defendant who didn't sign an agreement, they skipped over the whole series of them who had signed both confidentiality agreements and arbitration agreements. And so you don't, if not a typical case... You're right about that. I mean, it sounds like an estoppel, but that's not the estoppel that we have in DuPont or... It's different. It's different. But if you take a look, there's two concepts, Your Honor, that the courts have recognized in the estoppel that this violates, in the estoppel setting that this violates. Smith-Enron in the Second Circuit is a good case to look at, because it describes two principles that they violate. One is, if you pick and choose defendants to avoid naming signatories, when they're part of the same chain of liability, and it's obvious that you're leaving them out in order to do that, courts will stop the plaintiff from denying the duty to arbitrate, because had they signed, had they sued a signatory, you'd have a signatory on the defense side. In this case, you'd have at least one signatory. You'd have at least one signatory on the defense side. That's right. The second thing they've done is they've pled inconsistent theories of both liability and arbitrability. They're arguing we're a group that is controlled by Rode ESA, that is dominated by Rode ESA, that works in concert. If you read the complaint carefully, they mix and match Rodeo. When they want it to be an individual company, it's an individual. When they want it to be the group of companies, it's a group. Case law, again, not just the Smith-Enron case. By the way, the Smith-Enron case was relying on a case called the IDC case in the Seventh Circuit that Judge Posner decided. And there's some district courts in this circuit that have also adopted the same principle when you pick and choose. The Bannett case in the Eastern District of Pennsylvania says the same thing. But then when you also plead inconsistent theories and say we're going to group you for purposes of liability, but we're going to be punctilious about your individual corporate status for purposes of arbitrability, you're stopped from doing that. And it makes sense. You shouldn't be able to have it both ways. And that's what they've done. That also emerges from the Smith-Enron case. But other courts have adopted the same thing, including courts in this circuit. Let me just take a few minutes because we've gone over quite a bit. Yeah. I'm just trying to hit the jurisdiction. Why do we have jurisdiction? Appellate jurisdiction? Correct. Two reasons, Your Honor, I think. First of all, I think under the court's analysis actually in CTF, this is a final order, and let me explain why. In fact, you're saying that CTF was wrong. No. No, I'm not, actually. I'm saying actually under the same analysis that CTF applied, you do have jurisdiction as a final order. And I would also suggest that CTF lends support for why a pendant appellate jurisdiction exists over – and you're talking about the discretionary stay because there's clearly – I think I understand your argument. You're saying that basically if you're out of court because of the district court's ruling, it's tantamount to the – Granting of the stay in CTF. Correct. Because this case was removed under Section 205. If this court doesn't review the discretionary stay now, it never gets reviewed because it will be remanded and it never gets reviewed. So the only time it can be reviewed is now. And that is, I think, quite similar to the CTF analysis in reverse, which was when a granting of a stay effectively puts you out of federal court, then the court has appellate jurisdiction. Second thing is pendant jurisdiction, which when the issues are intertwined, as the court said in CTF, and in CTF the court found pendant jurisdiction again on the reverse scenario, but with the same factors. These are the same issues. These are the same remedy. Same facts go into it. And so – All of your causes of action, once you get past the FAA, all of your causes of action are state law causes of action. I'm sorry. All of your causes of action, there's substantive theories, are state law causes of action once you get past the issue of the New York Convention. I'm sorry. Are you saying the plaintiff's causes of action are – That's right. The plaintiff's claims are state law claims. There's no question. I agree with that. But my only point is, number one, there's no other time to review it as a matter – so it's a final order. And the second thing is, it doesn't – if you just step back, it makes eminent sense that if you're considering the Section 3 issue and stay, that the same issues, it's the same relief under a different legal theory, but it's the same relief that you're seeing. The same facts justify the relief. And, therefore, as the Court said, it's, I think, infused with special circumstances, rife with special circumstances in the CTF case. This is that for both reasons. Because we'll be out of court, we won't have a chance to have the discretionary stay ruled on, and because the same facts and remedy are in place in both with respect to the Section 3 stay and the discretionary stay. It pains me to remind you, but you deserve some time for rebuttal. I apologize. Yeah, well, thank you for your indulgence. Thank you. Thank you. Ms. Sullivan? Good afternoon, Your Honors. Kathleen Sullivan for the INVISTA appellees. I don't think I heard an answer to Judge McKee's first question.  Well, just to take us back there, I think you asked, since Rodea S.A., who is the only party that we're suing here, is not any longer a party to the Paris arbitration per the Paris Arbitration Tribunal, what possible relief could Rodea gain by a reversal here? And the answer is absolutely none. That is, Rodea came into this case, and as Your Honor mentioned earlier, it made the extraordinary argument that for the first time in the history of U.S. law, there should be a compulsion of arbitration at the behest of one non-signatory to an arbitration agreement in order to compel another non-signatory to an arbitration agreement into the case. So Rodea came into this case as a non-signatory to the JVA, Paragraph 23, which is the only arbitration agreement that's at issue in Paris, came in as a non-signatory, and it said, it tried to insert itself as a non-signatory into the Paris arbitration. And it came in and said, we're not a party, but we want to parachute into Paris, and we're going to abide by the Paris Tribunal's decision about arbitrability. And then, smack, the Paris Tribunal said, no arbitrability over Rodea S.A. And in this great long Paris Tribunal opinion that was sent to you as an attachment to the 28 J letters, the most crucial paragraph is Paragraph 210. And in Paragraph 210, the Paris Tribunal, on whom Rodea placed its reliance, in Paragraph 210, the Paris Tribunal says, in no uncertain words, the arbitral tribunal has no jurisdiction over Rodea S.A. So Rodea now comes to you not only as a non-signatory to the arbitration agreement, trying to compel another non-signatory, none of the INVISTA FLEs are signatories, it's now a non-party to the Paris arbitration. And it still persists in trying to argue to you that you should compel INVISTA into arbitration with a non-signatory to the Paris arbitration who's been declared by the Paris Tribunal to be a non-party to the Paris Tribunal. Are not the claims in your client's suit in Delaware the same claims that are being reviewed by the Paris Tribunal? The tortious interference and the misuse of information? They're absolutely not the same claims, Your Honor. And that's, I think, the key to the argument here about estoppel, prejudice, and all. It's really the key to the case. So let's try to parse these. And I think it would help to maybe look at some of the claims that are in the complaint. Let me just back up and say what's in the Paris Tribunal is a dispute over, as Your Honor mentioned, Paragraph 9, Article 9 of the JVA. That's a dispute between signatories to the Boudichemy Joint Venture. That's a dispute between them about whether the signatories to the JVA, because certain material is old enough, it's been disclosed more than 15 years ago, there's now a contractual right to use it. That has nothing to do really with our complaint here. Remember how this came about. We're trying to build an ADN plant in China. We're ready to do it in 2006. We have proprietary information that we bought from DuPont through the PSA and PTIA. Suddenly, Brody says we're going to build a plant in China too. So our view is that they have misappropriated information. And what we've alleged in our complaint, Your Honor, which is quite different from Paris, is really two kinds of claims. First of all, we've said we believe Rodia tortiously interfered with Invista's contracts with DuPont. The contracts we have with DuPont are the PSA and the PTIA. And what we say is we bought the Gen 1 technology from DuPont. Rodia now has tortiously interfered with our contracts with DuPont. Paris has nothing to say about the PSA, the PTIA, or Invista's contracts with DuPont. It has nothing to say about it. The dispute in Paris has nothing to do with DuPont. I thought that Rodia asked the Paris tribunal to establish, declare its expanse of ability to act in a certain way using such information that may have been confidential, may still be confidential. But, Your Honor, the dispute in Paris is over contract rights. We're alleging in our complaint, if you look at paragraphs 112 to 119 of the complaint, if you look at those, those are the tortious interference claims. They're at the joint appendix at pages 138 to 139. And what we say there is that there we are in Invista. We have a contract with DuPont. Along comes Rodia and tries to get DuPont, in violation of its contracts with us, to help it build a plant in China. That has nothing to do, nothing to do with the question of whether certain material owned by the joint venture has gone into the public domain after 15 years. It has to do with current attempt to get more recent information from DuPont. But, Your Honor, I think the second key way we differ from Paris is we've alleged, and here I would refer, Your Honor, to paragraphs 7 and 90 to 98 of the complaint. Paragraph 7 is at joint appendix 110 to 111. And paragraphs 90 to 98 are at joint appendix 134 to 135. And if you read those paragraphs, you'll see that what we're alleging is we don't know how Rodia got the information that suddenly enables it to build a plant and say it's going to build a plant in China with proprietary information. But we sure want discovery in an American forum to find out how it misappropriated that information by improper means. By the way, back in... You just put a couple of rabbits in your hat. You don't know how they got it, but it was misappropriated by improper means. Well, Your Honor, exactly right. But under the Delaware Uniform Trade Secret Act, all we need to allege is that it was obtained by improper means. We're not making a contract claim in Delaware. Paris is about a contract claim. Paris is about a very narrow, closed set of documents. Paris is about 11,600 documents who the Rodia parties say, hey, we get to use these now because they were disclosed more than 15 years ago. So we have a contract right under JVA paragraph 9. But that's just a prelude, is it not, to the real nub of the matter, which is do they get to build the plant or not? Isn't that really the key issue in both fora? Well, Your Honor, ultimately we care about our proprietary rights in both fora, but we're making entirely different claims. And that's why I think you've got to... You know, one's contract and one's tort. But that's exactly... But, Your Honor, that's exactly why our claims in Delaware are not duplicative of, will not result in inconsistent judgments with Paris. Why shouldn't we just send this back? I mean, there's substantial water under the bridge, as evidenced, I think, by both sides' 20HA letters. Why shouldn't we send this back to Judge Kugler and ask him to take another look at it in light of that water that's flown under the bridge since his first decision? Your Honor, the only question before you is legal. And the legal question is one this Court can resolve without remand. First Options makes clear that arbitrability is a question of U.S. law. It's a purely legal question. Unless the parties have unmistakably agreed to let arbitrability be a decision for the arbitrators. As Your Honor pointed out, of course we didn't agree to that here. How could we? We didn't sign Paragraph 23. We didn't sign the JVA. Nobody here ever agreed to let a Paris tribunal decide arbitrability. We're under the FAA. The Rodea parties removed and invoked FAA Sections 3 and 4. They invoked U.S. law. You can decide as a matter of law that they have no ground as a non-signatory to compel or force a stay on another non-signatory. You don't need any more facts. You've got all the information you need. Now, Judge, let's go back to the fundamental point here. Rodea is not a party to the Paris arbitration anymore. That moves their appeal under FAA Sections 3 and 4. And Your Honor asked at the end about jurisdiction. You have appellate jurisdiction from a final appealable order under FAA Section 16 insofar as Judge Kugler rejected Rodea's Section 3 and Section 4 claims. Those are appealable. You had appellate jurisdiction when there was a FAA Section 3 or Section 4 claim. But there is no FAA Section 3 or 4 claim anymore because Rodea has been kicked out of the Paris arbitration. So why isn't it kind of like CPS holding them? Why isn't it tantamount to an order which puts them out of court? Other way around, Your Honor. And I'm glad to see they've stopped fighting your decision, CTF holdings, for this court, and they've now accepted the ruling about discretionary stays. But let's go back. In CTF, there was no question that there was an appealable order. And then the question was could you also have appellate jurisdiction over the denial of a discretionary stay? We've got two kinds of appeals here. One is an appeal under the FAA from the denial of a mandatory stay or dismissal to compel arbitration. And then they append to that an appeal saying, well, if we're not entitled to a mandatory stay under the FAA, Kugler abused his discretion by denying us a discretionary stay under his inherent authority. We say that second branch of the appeal now has to go away too. The first branch is moot, and the second branch was pendent. The discretionary stay appeal was pendent to the appeal of the denial of the mandatory stay. Once the FAA claims are out of this appeal, we say they're moot. There is no pendent appellate jurisdiction over the discretionary stay. Just to go back to first branch. I'm sorry. You're going a little fast for my brain. He's from Pittsburgh. Slow it down a little bit. Midwestern town. It's moot because why? Because they are not parties to the arbitration. Exactly, Your Honor. After all, they're here. It's hard to say, Judge, make them arbitrate in a forum that we've since been ejected from. Judge, exactly right. How can a U.S. court... That's a preferred way to say what you said in the case. Your Honor, from Pittsburgh to Paris, no court in Pennsylvania can tell a Paris tribunal it's got to ingest a party it just spat out. They just said, Rhodia, you are not a party here. A U.S. court can't compel arbitration with a party that the Paris Arbitral Tribunal won't even entertain. All right. Then why did the Southern District of New York stay that case? It stays true. Did they just not buy your argument? Well, a couple of things on New York. We've just filed a motion for reconsideration in New York. We think that the New York decision, which, of course, is not binding on this court... Are those as frequently granted up in New York as they are in Pennsylvania? Well, this is a complicated case, but as Your Honor pointed out in CTF, judicial economy, judicial efficiency, is not a reason to deny litigants like Invista their place in a federal forum. And, Your Honor, in New York, we think, to just boil it down, there's two mistakes. So we moved for reconsideration to reinstate our contract claims against DuPont in New York. And the two mistakes was the judge in Southern District of New York forgot to notice that Rhodia is not a party in Paris. So when the district court said we should wait for Rhodia to get its things resolved in Paris, they kind of forgot a key fact. Rhodia isn't in Paris anymore, Rhodia S.A. And the second thing is we think that the district court just fundamentally misread the contract. Just to go back, Your Honor, what Invista is aggrieved by is that we bought Gen 1 technology from DuPont. We bought it under the PSA and the PTIA, which created duties on DuPont's part of confidentiality. That's PSA 5.20 and PTIA 7.1 and 7.6. We had privilege obligations. We claimed that DuPont breached its attorney client and work product privileges with us. And we had non-compete agreement with DuPont. Our agreement with DuPont says, we bought your technology. Don't go out and help somebody else like Rhodia compete with us. In New York, we're suing DuPont, saying there's been a breach of all those contracts between Invista and DuPont. And we think that the court in New York fundamentally got confused. It got the JVA mixed up with the PSA and the PTIA, and it just looked at the wrong contract. Harris is never going to resolve anything about a breach of the PSA or the PTIA. That's between Invista and DuPont. But anyway, even if New York were right, we think it's terribly wrong, but it can't bind your decision. It shouldn't even influence your decision because our case is about different parties. New York's about DuPont. This case is about Rhodia. And New York is about a different set of agreements. It's about, you know, a different set of agreements. And it's about – it's just in a different posture. So we think it's wrong, but – That's fair to say that. I don't know how I could quarrel with that, different parties and different technical legal issues. But I'm still troubled by the notion that the parties in this case and the parties in the arbitration and the parties in New York seem to have gotten themselves in this web to which there's no exit strategy. And what if the arbitral panel in Paris says that Rhodia can build the plant? And what if Judge Kugler says they can't build the plant? And what if New York says, I don't know, something halfway in between? I mean, you know, the purpose of our system is to get to the finish line and resolve disputes, not result in this Gordian knot that can never be cut. Fair enough, Your Honor. But we think it's very simple. I think that probably at least half of what my colleague, Mr. – my friend on the other side, but half of what he was saying talked about defenses on the merits. He can make all the defenses on the merits he'd like about whether, in fact, Rhodia parent has some right to access from – to information from Rhodia subs. Where he should make that is on the merits back in front of Vice Chancellor Stein. What should happen here is you should moot the appeal, dismiss the appeal as moot. You should dismiss the discretionary – part of the appeal from the denial of the discretionary stay is lacking pendant jurisdiction. It should go back to Judge Kugler. He'll properly divest himself of jurisdiction, send the case back to Vice Chancellor Stein in the Delaware court. And if Rhodia has something to say about how it has a right to any of this confidential information, they can tell it to Vice Chancellor Stein. Now, the key fact I want to focus on – I'm sorry, I have to interrupt you because I'm not sure you – So it's not a Gordian knot, Your Honor. I'm sorry? It's not a Gordian knot, that the defenses on the merits can be interposed in Delaware. And if there's any question about whether the Delaware case ought to defer to the Paris case, if there's any sub-portion of the Delaware case that's about that old 15-year-old information that now there's a contract right to, Vice Chancellor Stein can carve that out of the case. But the rest of our case – Isn't there a risk of inconsistent results between Delaware and Paris? Not at all, Your Honor. And if I could go back to Your Honor's remark about Paris, Paris isn't going to – I think I gave Mr. Green about two five-minute terms. Why don't we add ten minutes to this one? Thank you very much, Your Honor. You're being very indulgent with both sides, and we appreciate it. Thank you. I'm a real masochist. Judge Hardiman, I just want to go back to what you said earlier. Paris is not going to decide – the Paris Tribunal is not going to decide whether the plant can be built in China. The Paris Tribunal has an extremely limited role. First of all, the partial award is not final. If you look at paragraph 255, it makes clear that there are many issues that remain. And your interest in the licensing agreement may come back in Paris if they look at it later, but that's not before them now. In paragraph 274 of the Paris Tribunal, the Tribunal reminds us, at this stage it is not a question of establishing which information is legally in the claimant's possession. That is reserved for the second phase of the proceeding. So we don't even know yet whether that closed set of 11,600 documents, who the other side says is more than 15 years old, we don't even know if they're going to get a contract right to that. Frankly, we don't think that they're going to build a plant in China with ancient information. The reason we're suing them is that we fear – Well, good place to deal with ancient information in China. Well, sometimes the ancient information is the best when it comes to buildings. But to go back to Judge Ruth's question, our claims here are fundamentally different because what we're claiming here is there's been tortious interference by Rodea within VISTA's relationship with DuPont, that Rodea induced DuPont to team up with Rodea in violation of its agreements to us, non-competing agreements, confidentiality agreements, privilege agreements. Team up with it to build a plant? But Paris, Judge Hardiman, the key thing is the cause of action in Paris that the Rodea entities brought is not about we have a right to build a plant. It's about we had a right to just use 11,600 documents. The information contained therein, which is so useful, that it may result in the ability to build a plant. No, Your Honor. There won't be an inconsistent judgment. Just to go back to your point about inconsistent judgments, the Gordian knot gets untied in the great state of Delaware. It gets untied there because, as the district court in New York said, DuPont is subject to suit in Delaware. So if you do the right thing, dismiss this case as moot or affirm, we're perfectly happy to defend it on the merits as well, but send it back to the district court. District court divest, it goes back to Delaware. The DuPont suit can be moved to Delaware, and there won't be any inconsistent judgments. There won't be any inconsistent judgments between New York and Delaware because the New York suit can be moved to Delaware. Remember, we can sue DuPont in Delaware. There's obviously jurisdiction there. We contracted to sue in New York, but DuPont has consented to be sued in Delaware, so it goes to Delaware. And to answer Judge Ruth's question, there won't be any inconsistent judgment with Paris because Paris is only adjudicating contractual rights to 11,600 old documents. The only way we win in Delaware, apart from a ruling on those documents, is by finding that there's other sources of misappropriation by improper means. And that's not fanciful, Your Honor. In Texas, when we were in Texas and we didn't know this, we found out through the limited discovery that an American forum finally gave us in this case. We found out that Rodia Entities had basically pulled up a station wagon to a loading dock in the middle of the night, loaded 30 boxes of documents into the car, and driven away with it. And nobody could be assessed by improper means. They did it with boxes? Boxes. Well, the loading dock was in France, Your Honor, but the point we're making here is that having found that out, we don't know whether there are other improper means by which more recent information was obtained from DuPont or from the joint venture that has nothing to do with what proprietary information is more than 15 years old. And that's why there won't be any duplication. If any part of their information really came from those old documents that Paris is going to decide about, Vice Chancellor Stein can carve that out of Delaware, leave that to one side, and decide whether we have tort claims on the remaining cases. The indirect or direct relationship between the Paris ruling on the information, the documents, even that limited amount of documents, isn't it possible that there would be some conflict in ruin? No, Your Honor. We think that to the extent there's any defense on the merits, say the Paris tribunal says, ah-ha, you've got a right to 10,968 documents, then Rodea can come in. And those documents happen to contain the formulas. Then Rodea comes into Delaware and they have a defense on the merits. They say, you can't sue us in tort. We have a contract right to the property. It wasn't misappropriated because it wasn't secret. And that would have a stoppel effect. Well, it depends on which parties it's used against, Your Honor. But the point I'm trying to answer is that there is an efficient solution to this. That is for you to dismiss the appeal as moot or alternatively just affirm Judge Kugler, send this case back to district court in Delaware, which will send it back to state court in Delaware. New York may move to Delaware. That's certainly what the judge in New York suggested and what DuPont has acceded to. And to the extent there's any ruling from Paris, let them raise it on the merits in Delaware. But we shouldn't be deprived. Your Honor, in CTF, as you emphasized, a party that's properly in a federal litigation forum should not be sent off to an alternate forum, at least not on a discretionary basis, absent exceptional circumstances. And there aren't any here because there's no risk of prejudice to the other side. There's no risk of inconsistent judgments. If I could just take a few minutes on the estoppel theories, Your Honor, because I think you established in your long colloquy with my friend on the other side that there is no contract right to arbitrate here. They can't rewrite paragraph 23. Paragraph 23 of the JVA couldn't have been clearer. Arbitration agreements in other contracts have nothing to do with the arbitration agreement under 23. So there's no contract right to arbitrate here. This is a non-signatory trying to force another non-signatory into arbitration based on estoppel principles. Now, first, back in the district court, Rodia said, oh, we're entitled to equitable estoppel. Under equitable estoppel, they said, that's when a signatory to an arbitration agreement can force a resisting non-signatory to arbitrate with us. But we know now the answer to that question, and my friend didn't even raise it today. Rodia's not a signatory. Karen said it's not even a party. And so equitable estoppel is out of the case. It's just gone. There's no case out there that says that the equitable situation is giving rise to the equitable estoppel could not also come into play and control where you have two non-signatories. Your Honor, you were absolutely right when you said earlier that there has never been a case in which there are two non-signatories. There's never been a case saying a non-signatory can compel another non-signatory, and the reason is obvious. Arbitration is a creature of contract. If you have two non-signatories, there's no contractual basis for it. Estoppel cases throughout U.S. law have only existed where there's a signatory on one side or a signatory on the other side. Here you do not have a signatory on either side. That's not true in the contract case. I mean, the typical contract estoppel situation arises precisely because there's no contract. It isn't the, you know, when you think of promissory estoppel, for example. So why aren't they right that a party should be estopped from seeking all the benefits of an agreement while trying to deny its purported detriments at the same time? Well, Your Honor, we're not relying on the agreement. The key to that argument is that INVISTA is not relying on the JVA. INVISTA doesn't benefit from the JVA directly. The test for equitable estoppel under your decision, you alluded to it earlier, Judge McKee. DuPont v. Roane Polank says no equitable estoppel unless there is a direct benefit from the contract which contains the arbitration agreement. INVISTA doesn't benefit from the JVA, to which it's not a party. We benefit from the PSA and the PTIA, which are our agreements with DuPont. That's how we came to own the information. So there's no direct benefit. We flip it. Now INVISTA finally takes one last... I'm sorry, now Rhodia takes one last bite at the estoppel apple, and now they say, oh, well, forget about equitable estoppel. They know they're not a signatory. No court has ever allowed a non-signatory to invoke equitable. They say, let us invoke what they call alternative estoppel. And that's the notion that sometimes a non-signatory, and Rhodia says, okay, so maybe now we're a non-signatory. We can now invoke estoppel against a signatory. Now we're not a signatory. Paris can't turn us into a signatory. We never signed the JVA. None of the INVISTA entities did. By the way, Your Honor, just to go back to Paris, if you look at what Paris did, the Paris tribunal said INVISTA-SARL is in the arbitration, but it said that INVISTA-North America is not. And then there's another INVISTA party, who's before you, INVISTA-Technologies, who's not even in the arbitration. So even if you bought their alternative estoppel argument, you're still stuck with two plaintiffs here who have nothing to do with Paris, one that was denied jurisdiction in Paris and one that was never in the Paris arbitration to begin with. But put that aside, the key to the alternative estoppel argument, Your Honor, even if you thought somehow one of the three INVISTA parties was now suddenly transformed into a signatory in Paris, which we weren't. Of course, we think the Paris decision is wrong. We've moved to set it aside. We objected to jurisdiction in Paris. We objected at every stage, and under this Court's decision in first options affirmed by the Supreme Court and China Min Medals, we don't waive our objections to the jurisdiction of the arbitrable panel just because we participated there under protest. But put that aside. Imagine Paris was right. There's still no alternative estoppel here, and the reason is what we discussed earlier. The issues are not inextricably intertwined. The case here is about tortious interference between Rodea on the one hand and Dupont and INVISTA's contractual relationship on the other, and it's about misappropriation by improper means. We have a right to a federal forum. We've been trying to get a federal forum. We've been trying to get discovery to find out who stole our secrets, when, what, where, how, and why. If there's ever a contractual right that comes out of the Paris arbitration, they can raise it as a merits defense in Delaware. So with respect, we think you should just hold the original appeal moot and dismiss the appeal from the discretionary stay as lacking jurisdiction, lacking pendant jurisdiction. The whole case goes away. That's Occam's Razor here. They wanted Paris to rule. Paris ruled. They lost. They got kicked out. They really have no standing to come to a U.S. court and, say, send us over to arbitration in an arbitration panel where we're not a party. If you don't agree with that, though, Judge Kugler's decision was absolutely correct, and you should affirm it. There's no basis for equitable estoppel. That's confirmed by Paris, because Paris said Rodea's not a party there, and there's no basis for alternative estoppel because we've got two entirely different sets of issues, not intertwined issues, but totally different sets of issues. And, Your Honor, with all respect, we suggest that this court should not be the first to ever produce the bizarre result that a non-signatory can compel arbitration with another non-signatory, especially not when the party seeking arbitration has been kicked out of the very arbitral tribunal it's trying to invoke. Thank you very much. Thank you. James West? A few things, Your Honor, and I'll try to make it brief. The first is I think the notion that the arbitral tribunal is not going to decide the fundamental issue in this case is simply wrong. This case started over the first issue in the case was public announcements that went out that said that each side was going to build an ADN plant. They immediately said, if you want to build an ADN plant, you can't use any technology, any Gen 1 technology. The rhodia entity started an arbitration to determine that question. The idea that this case isn't about the same thing that the Paris arbitration is about is a post hoc rationale that's been developed after the Paris arbitration assumed jurisdiction over that. You are blending a result with an issue. The issue that the arbitration in Paris first was instigated by your client was who has a right to these documents and information. What you do with it leads to the rest of this legal contest in the three states. What we've asked the arbitral tribunal for in the... What you ask doesn't matter anymore because you're out of it. No, but our affiliates, our rights are completely... The rhodia entities are continuing to participate in it, rhodia operations, rhodia mill. The rights are going to be determined. That's why there is a risk of inconsistent adjudications for sure because they are going to determine whether the rhodia companies can build an ADN plant using the documents that the rhodia entities have said is all the documents they need to build. That's my problem because a right to the documents does not necessarily give a right to build a plant. It does, Your Honor, because the contracts say... I think just to clarify that, the contracts say that if you have the right to access, you have the right to use and disclose. That's the whole point that we put to the tribunal is do the rhodia entities have the right to use and disclose to the world, obviously including rhodia SA, but it's not important whether it includes rhodia SA. The point is the rhodia entities are going to get a ruling that the documents they need to build that plant are or are not free to be used and disclosed to build the plant. That's what that's about. That's what that case is about. All right, so if you get that ruling, then you just bring that into Delaware State Court and you win, right? Well, I don't know, Your Honor. I mean, I doubt they'll be taking the position at that time that it has preclusive effect. They may have an estoppel on it. There may be a judicial estoppel at that point. I agree. I don't think they'll throw the towel on that in light of the dogged way that all sides have fought in this case, but that seemed to be suggested by your able closing counsel's argument. I think the other thing is that there are claims in this case which are misappropriation-based. Let's hold the PTIA PSA claim aside. That's only one claim. All the other claims are misappropriation-based. In order to establish a misappropriation, it is part of their claim, and I would just read paragraph 4 of the complaint. The technology was licensed to the joint venture, and the parties to the joint venture signed strict confidentiality agreements. That's the JVA, restricting the use of the trade secrets from there on. Paragraph 54, from the outset of the joint venture, the joint venture partners agreed to maintain the confidentiality of DuPont's proprietary information. The whole point of that is that their misappropriation claims are completely wrapped up in the contracts. They have to be. They shared the information with a competitor. You're saying B contracts are the exclusion of the PSA? I'm putting the PSA and PTIA aside. Those claims are different. Why couldn't those claims arise totally out of the PSA and the PTIA? I'm sorry? Why couldn't those claims arise solely from the PSA and the PTIA? Because the confidentiality agreements that would restrict Rodea and our ability to use them have to be in the connection with the JVA, the PTIA and PSA. But why? Why would it have to be in connection with the JVA? Because we don't get any information pursuant to the PTIA and PSA. That's between DuPont. We've never even seen it. That's between DuPont and Rodea. Excuse me, DuPont and Invista, whereby Invista got purchased the assets. It has nothing to do with the flow of information that went into the joint venture. You didn't sign it. We didn't sign it. It's got nothing to do with us. So that was a tacked-on claim, Your Honor. That was a tacked-on claim in order to create some non-arbitrable issues in this case. But what Judge Jones says was it's all wrapped up in the same question. It's all part of the scheme to misappropriate. And the misappropriation is being decided in the Paris arbitration, in the ICC arbitration. Courts have said, many, many courts have said, you don't look at the label the plaintiff puts on the case. The fact that it's a tort case doesn't matter. As the court said in the DuPont-Rome-Poulenc case, the court said you look at we don't care what the plaintiff says about the case. The question is what's the core issue in the case. The core issue in this case has been from the time they started it in Texas, a complaint that we cannot use any information to build the ADN plant. That's what this case started as. That's what it's about. If there's any collateral issues after that, believe me, they are the tail wagging the dog. It's all about whether or not we can build the plant. That issue is going to be decided, with or without RODIA SA's specific presence. RODIA Operations and RODIA NIL are participating in that. The same tribunal that they trumpet as having thrown RODIA out of the case also held that INVISTA SARL is a proper party in that case. That they want to walk away from, but they want to bind RODIA to the holding that they're not a proper party. We're willing to live with it because it doesn't change the status here. We were a non-signatory to the JVA before. We admit that. We can't make ourselves a signatory. We were a non-signatory to the JVA before. It doesn't matter. But the difference is they've been held. INVISTA SARL has been held to be akin to a signatory. So now we're in the very classic alternative estoppel situation, where a non-signatory, RODIA SA, is invoking the estoppel principles because, A, it's closely aligned with signatories, which in this case are their wholly owned subs. It's a classic situation, though, because INVISTA SARL is only in because of their participation in the meetings. They're not a signatory, which is the classic. Correct. They've been deemed, in effect, to be a proper participant, a beneficiary. One step removed. I'm sorry? It's an assumption, kind of one step removed. Understood. But I also think it's not fair to say, like, they would have the court take. The takeaway is not that they had, you know, they were foreign to the notion of arbitration. They signed by, again, DuPont signed, and they now own the document that signed an arbitration clause that started with the license. So every agreement that tracked the flow of information always had an arbitration clause. It would be unfathomable to the founders of this JV that any dispute over the use of Gen 1 information, which was covered in every agreement when it moved and had an arbitration clause, that that dispute wasn't arbitrable. What about Ms. Sullivan's argument that if we accept what you've said recently that that only helps you with respect to one of the three plaintiffs here? Your Honor, they lump themselves as one, number one. The complaint defines them. They basically say they all own the technology together, and they are one plaintiff. Once they define themselves, the rest of the complaint is in VISTA. That's number one. And number two, a stay protects all of the parties, because if under their own theory, in VISTA SAAW will be participating in the arbitration, under protest they're participating in the arbitration, that arbitration is going to make determinations. And it doesn't matter, just like it doesn't matter whether Rodea S.A. is a party, or whether a VISTA SAAW is objecting to being a party, there are two signatories to the contract who aren't objecting to the personal jurisdiction of the tribunal over them. The rights are going to be determined in that arbitration. That's where the inconsistent adjudication risk comes in, and it's very real. And I want to explain just for one second, the harm is extremely real, because what Rodea needs and is trying to get out of that arbitration is certainty that it can use the documents it believes it's entitled to use to build the plan. That's what this dispute has always been about. That's what they've sought a declaration from the tribunal to do. That's what the tribunal has said it sees the jurisdiction to do under the JBA. That's what it's going to do in phase two. What a VISTA would like to do is have a cloud hangover Rodea has had in the marketplace so that that question is never resolved, so that that question would never get certainty. The more fora that there are that are open, the more opportunities they have to create the question and say there's still issues to be decided, there's still issues to be decided. That's why the risk of inconsistent adjudications in this case is real harm. It wasn't present in the CTF case. It is present here. It does meet the discretionary stay clear hardship test. And getting to your point, Judge Hardiman, we do think a stay protects everybody's interests because the fundamental issues are going to be decided in the arbitration. That's number one. Maybe. Who knows? The arbitrators have said they will. The arbitrators, they've done unpredictable things in the past. There's no reason to believe that they won't. Their rulings have said to date that they have taken jurisdiction over the issue. They've set a briefing schedule. We have a hearing date set. Which is what? For March of 2011. That's a full three-week merits-based hearing that's going to consider whether or not RODIA can build the plant using the documents that it has said it needs to use in order to build the plant. If we can't build the plant with those documents, then I guess we'll have been wrong that we can't build the plant. We believe we can. But that's what the arbitral tribunal will determine. And just to get to Judge McKee's question about two non-signatories. We did cover that. It's not rebuttable anymore. We did cover that. Thank you very much, Mr. Greenblatt. It's exceptionally well-argued on both sides. As complicated as this case is in both, you, Mr. Greenblatt, you have an extraordinarily competent counsel who did a wonderful job. I tend to think, especially when I was listening to this between New York, Texas, France, and then back to Delaware, I only think that John Deist v. John Deist would make the rocket if I could compare it to this case. We've put on a lot of miles, Your Honor. And Beaumont in the summer at a 10-hour hearing on jurisdiction. And many more to go before you sleep. Thank you. Thank you. Thank you.